May it please the Court, my name is Brian Miller. I am counsel for the Plaintiff and the Appellant herein. This appeal concerns the judge's abuse of discretion in failure to grant a new trial and in various evidentiary rulings during trial. For purposes of oral argument, I will focus on two critical issues and, if time permits, on a third. The first critical issue is that of defendant's failure to turn over critical photographs during the trial of a photograph which was introduced over objection during trial. And the third issue, should time suffice, is that of juror misconduct. Turning to the first issue at hand. GINSBURG So are you – that's – the three issues you mentioned have to do with your motion for a new trial. That's what you're arguing, with your three grounds for moving for a new trial? COLLINS That's correct, Your Honor. GINSBURG As opposed to the underlying evidentiary errors? COLLINS I'm arguing two things, Your Honor. One is there was an abuse of discretion in admitting the altered photograph during trial. And secondly, when these issues were re-raised in the motion for new trial, there again was an abuse of discretion. And the photograph which was not turned over during discovery was only discovered during pendency of the motion for the new trial. It is undisputed that a profile photograph of plaintiff appellant Sean Burton McGregor depicting serious injury to his right-hand face was not turned over during the discovery  GENERAL VERRILLI Is that something that the defendants in this case are responsible for? That is, you've sued individuals, you've sued the chief, and these other pictures turned up someplace else. Is that right? GINSBURG If I understand, Judge Reese, your question correctly, is the question one of control? That the State of California, for whom these individuals GENERAL VERRILLI The State of California, is that a defendant in this case? GINSBURG No, but the California GENERAL VERRILLI Is anybody sued? Is Chief Madigan sued? GINSBURG Is he sued in official capacity? GINSBURG He's sued in his individual capacity, Your Honor. GENERAL VERRILLI And if the photos are in the possession of somebody else, how would these defendants be responsible for that? GINSBURG Well, these individuals worked for the California Highway Patrol. And these individuals undoubtedly would have control through the discovery through the California Highway Patrol. And the California Highway Patrol had control over the photographs. Should I address that further, Your Honor? GENERAL VERRILLI I don't want to use up all your time on this. I'm not sold so far on what you've argued. It seems to me you sue people as individuals, and you've got to point to them and say, you had control of these. I don't see how one highway patrolman is going to have control over some pictures that some other highway patrolman might have someplace else. GINSBURG Well, the critical issue, Your Honor, is that Captain Madigan was the chief of the Indio Police Division of the CHP. He worked for the California Highway Patrol. The other named officers all worked for the highway patrol, the California Highway Patrol, and armored the State of California. All production was sought through them and came from the California Highway Patrol. It is not the individual officers that themselves maintained control over the documents. All the documents produced in discovery came from the California Highway Patrol. It's not the individual officer that maintains control of the arrest report, of the incident complaints, or of any of the materials. All the materials come from the State of California, vis-à-vis the California Highway Patrol. JUSTICE ALITO Go on. You'd better go on to something else here before you lose all your time. GINSBURG The photograph seriously undercuts defendant's argument throughout trial that the de minimis injury was caused, that de minimis injury was caused by the officer. The photograph highlights that serious injury was caused by Officer Jason Collins in beating him. And this works both ways. The photograph bolsters plaintiff's evidence and the photograph severely undercuts defendant's evidence, because defendants argued throughout trial that plaintiff was not seriously injured. And ---- GINSBURG Which is the photograph that you're saying was never turned over? GINSBURG This is in excerpt of Record 41, 41 in the profile photograph. GINSBURG And you're saying that the one that was used doesn't show any injury. GINSBURG The one I look at sure shows some injury. And the question is, but you can look at it and see injury. GINSBURG What I'm saying is that the profile photograph in excerpt of Record 41 was never turned over until it was discovered during the motion for new trial. GINSBURG Yes. And my question is, to what extent does it show injury that isn't shown in the booking photograph? GINSBURG It shows significant injury to the right-hand face, Your Honor. GINSBURG Yes, which is also, I mean, I don't know if it's significant or not, but it shows injury, and so does the booking photograph. GINSBURG The booking photograph, I might add, was also not turned over until in the midst of trial when it was turned over in a highly ---- GINSBURG It was turned over and it was used, and that was one among a bazillion photographs that were actually introduced at trial. GINSBURG Well, Your Honor, it's not one among a bazillion photographs. It was five or six or seven. There were a lot of them. GINSBURG There were five photographs which were introduced at trial regarding Mr. McGregor. GINSBURG Look, let's not get distraught. My question is just real simple. What does the photograph that you say wasn't turned over, what does it show that the others do not show? GINSBURG It shows serious injury to the right-hand face of Mr. McGregor. And you're telling me if I look at a front photograph of him in the booking photograph, I will see no apparent scarring or injury on the right-hand side? GINSBURG That's exactly right, Your Honor. GINSBURG Then what am I looking at? GINSBURG You are looking at the bottom photograph at Excerpt of Record 41. GINSBURG Yeah, but I mean I'm looking at the front view. Well, it's there to see other than it's all, he's got red marks above his right eye and it goes down below his glasses and continues on to his cheekbone. Now, I don't know whether that's serious or not serious. That was a trial issue. My question is why is this one side view photograph so critical that you get a new trial? GINSBURG The side view photograph is so critical because it's consistent with the beating by Officer Jason Collins. And it was also withheld during evidence, Your Honor. GINSBURG I said I have the same question. Why is it the side photo or the one that was withheld, how does it show significantly different and more excessive force was used? GINSBURG Two reasons, Your Honor. One, it is consistent, which I already stated to the Court, that Mr. McGregor was severely beaten by Officer Collins. But secondly, it undermines the proffer which was made by defense counsel to the district court that Mr. McGregor's injuries were consistent with those of his eyeglasses. And this was the proffer which was made by defense counsel to the district court and it goes to the argument that they made that the only reason, his only injury came from the eyeglasses penetrating? GINSBURG That's correct, Your Honor. GINSBURG Okay. Well, that's the two. Okay. Now I see what you're arguing. GINSBURG That's absolutely correct, Your Honor. GINSBURG The injuries were other than just where the glasses were in the second photo. GINSBURG Exactly right, Your Honor. GINSBURG Okay. Now I get what you're saying. We're really staying too much time on this. I'm really interested in your argument regarding the juror misconduct. GINSBURG Let me turn to that right now. Just one last closing sentence on the former topic, Your Honor, and that is there was a colorized photograph which was altered, which was introduced during trial, which plaintiff objected to. Scalia What evidence is there that it was altered? GINSBURG The red color hue, the change in alteration of the mouth and the change in the distance behind the eyes. Now I understood that it was simply printed on a different printer, one that had color, and that the other picture was not printed on one that had color. Is that right? GINSBURG There's absolutely no evidence in the record indicating that the photograph was as a result of printer error. I'm not talking about printer error. You can print photographs with color or not color, depending on what machine you use. GINSBURG I think, first of all, there was a declaration and three expert witnesses willing to testify as to the alteration of the photograph, which would not be as a result of printer error. If I may, I would like to turn to Justice Wardlaw's question. Judge Reese. Go on. Justice Wardlaw, you asked me a question as to that of juror misconduct. I'm especially concerned with the issue of juror misconduct in this case. The Court held three evidentiary hearings regarding this matter, and the plaintiff readily acknowledges that the district court is granted substantial deference in making findings of credibility. However, the findings of the district court are not precluded from absolute review, and that is indicated in the case of Anderson, the United States Supreme Court, of Anderson v. Bessemer. And two factors militate against a finding that Juror Hollenhorst told the truth. One is there was an independent, unbiased witness who came forward and testified that the juror in question, Juror Hollenhorst, lied during voyeur d'oeuvre. This independent officer of the Court testified that he heard Juror Hollenhorst's testimony. And the other factor is that the judge's job there, who sees the people to judge the credibility, you've got a very good argument, but the judge there judged credibility. He came out with a certain answer, and I don't see how you can go behind that. You don't want us to judge the credibility because so-and-so was more credible than so-and-so. I understand fully what you're saying, Judge Reese. However, I'm saying even though that difference is granted to the district court judge, that difference is not absolute. And it's not absolute when there is an independent witness, a sworn officer working in the district court who comes forward and says he heard the juror say, they should have known I would be for the police. The judge doesn't have to believe the pro se clerk. The judge does not have to believe the pro se clerk. However, the pro se clerk testimony under oath, whereby he testified that he was standing 10 feet away from the juror who made the statement, they should have known I would be for the police, coupled with that of the inconsistency in the juror's statement, those taken together clearly indicate an abuse of discretion. And the judge erred in finding that the juror did not lie during voyeur die. It is those two factors which allows this court to go beyond the abuse of discretion standard, giving deference to the trial court's finding of fact. Juror Hollenhorst, as articulated in plaintiff's brief and in the reply brief, was totally inconsistent in his testimony. It was totally unbelievable. He recalled facts on May the 19th, which he did not recall on January the 14th of 2004. So his memory increased with the passage of time. And his testimony was wholly inconsistent. The district court's court order on the finding on this matter was also wrong. It was wrong for several reasons. It attributed a statement which was made by juror Hollenhorst to that of Officer Green. On cross-examination, Officer Green denied making that statement. Secondly, the district court also erred in it applied the wrong standard as to that of impeachment evidence. The district court held in its order that because Mr. Hollenhorst made the statement out of court, it did not carry the weight of testifying under both. Well, plaintiff contends the exact opposite is true. It is precisely because the statement was made out of court that the plaintiff was the juror was more. Actually, the way I read how it all went down is that the judge said, look, this was in an environment where everybody was talking. There was a whole bunch of conversations going on at the same time. It was noise. The trial was over. And people said and thought lots of things, and I just can't find the way you want me to find it. I mean, I don't know how we second-guessed that. Well, why? True. I mean, that was what happened, exactly. There were a whole bunch of conversations going on, and people were saying this and that, and maybe somebody actually thought, well, they should have known that he would favor the police, and that comes out then as being something they heard rather than something that they themselves thought. Two responses to that, Justice Reimer. I think that is what Judge Larson at the district level wrote. Yes. And why is why should we be firmly convinced that that's wrong? The circuit court should be firmly convinced that that is wrong because of the testimony of the pro se clerk who unequivocally heard the statement and submitted the declaration thereof, and secondly, because of the totally inconsistent statements of the juror who was cross-examined during the motion for the new trial. And it is for those two reasons that this Court should go beyond the district court's findings. It is the totally unbelievable testimony of Juror Hollenhorst coupled with the independent witness. And those are the criteria which are indicated in Anderson v. Bessmer and in numerous Second Circuit cases. It is when this case presents such unbelievable evidence that this Court is entitled to go above and beyond the finding of the district court. Let me ask you how this interacts, this juror, alleged juror misconduct interacts with your Section 148 argument, your Section 148 argument that the evidence that your client was not convicted under Section 148 should have come in. Your Honor, in brief, it directly ties because all of the evidentiary issues were kind of bound up together. However, Hollenhorst came to the Court with the knowledge regarding Penal Code 148, and he stated that officers never issue Penal Code 148 for nothing or when a suspect has not done anything wrong. He came to the Court. He came to the courtroom with a bias against law enforcement, with a bias in favor of law enforcement and against my client. And that directly ties to bias. It ties to bias which was concealed during Voyer Dyer. If the Court has no further questions, I would like to preserve the remaining time for rebuttal. Surely. Taglianti. Thank you, Your Honors. Good morning. David Taglianti, Deputy Attorney General. On behalf of the defendants and appellees, Jason Collins, Thomas Clark, William Green, and Christopher Madigan. Can I just clear up a question that Judge Reed focused on? These subsequent mug shots that were produced following the trial, why were they produced? Who were they produced by? Were they in response to a subpoena? How did that come to be that they were produced? Your Honor, the mug shots that counsel was talking about were never produced until he requested the opportunity to see the original booking photo during the Moshe Bernutin trial proceeding. It was at that time that he was given access to the Sheriff's Department. Well, he had access to the Sheriff's Department's records, of course, initially. But it was at that time that he took the opportunity to go to the Sheriff's Department, get the mug shot profile, and then learn that there were additional photographs in addition to the Exhibit 225 that we marked and introduced. Had there been any prior document requests or interrogatory requests or anything else to which the Sheriff's Department should have responded by producing these mug shots? Not to my knowledge. There is nothing in the record to that extent. Did the Sheriff's Office, that's where those undiscovered photographs came from? Yes, Your Honor. They're in the possession of the Sheriff's Office. And the only reason they came, to my knowledge, is that because of plaintiff's testimony at trial, it was my belief that there could be additional photographs that would prove enlightening to the jury. And indeed, I was advised of the booking photograph. It was at that time that I came across Exhibit 225 in a smaller form. It was blown up maybe one and a half, two times for ease of juror viewing. But my entire intent there was simply to show the jury in impeachment that the truth of the plaintiff's testimony was frankly not established. That is, that he was not bleeding profusely at the jail, that he was not pummeled and beaten nearly to death by Officer Collins. And it was based on those reasons that I sought to introduce the booking photograph, Exhibit 225. I want to add that at no time was that photograph in the possession of the defendants. It was at all times in possession of the Riverside County Sheriff's Department. The photograph was obtained by me during trial approximately one week before it was introduced at trial. Discovery, of course, was long since expired. And the only discovery request that I believe is part of the record in evidence here is the request on Officer Collins. And there's no evidence to support the argument that Officer Collins ever possessed or had the right to possess that photograph, nor is there any evidence that there was a protocol by the California Highway Patrol that would allow them to go to the Sheriff's Department to secure that photograph in responding to a discovery request. With regard to the alteration of the photograph, Your Honors, let me make clear that the district court found that there was absolutely no foul play. There was no evidence, and there was none in the record, suggesting that that photograph, Exhibit 225, was altered in any way, shape or form. The information that was known by the district court and on which the district court relied. What about Dr. Lackey? In what sense, Your Honor? Dr. Lackey was going to testify that there were changes in the photograph. Actually, Dr. Lackey, my understanding, was going to testify as to the subliminal impact on the jury that the color red had. But there, of course, was no evidence of the color red, if you will, being or marking him as a dangerous felon or as a criminal. Moreover, the district court cautioned the jury that the jury is not to consider whether or not the color red has any bearing. Moreover, we have the photographs that were also marked as exhibits and introduced without objection that display or depict the plaintiff moments after the arrest at the hospital with essentially the same undershirt, the red undershirt. Is there a science that says that color red indicates a person is violent by nature? Not to my knowledge. There's certainly no common knowledge. There's no scientific information. There's nothing in the record. Is that why USC wins the football game? I'm sorry, Your Honor? They fight the opponents. That's a pass. It's a joke. I'm sorry. And this is the last comment I have. I'm sorry. Being a UCLA fan, I got the joke. Finally, with regard to juror misconduct as described by Mr. Miller, it is important that this Court recognize, and I believe it does, that the district court went to great pains to understand the evidentiary support and support of the motion for new trial on that basis. There were three hearings, two evidentiary, excuse me, one in January of 2004 and the second in March of 2004, or in June, actually, or May of 2004, I apologize. In any event, there are clearly differences as to what people heard, but the most important issue is that Mr. Chavez came forward seven months after the trial. He was involved in a hallway environment. There were pockets of conversation, admittedly. He was not speaking directly to Mr. Hollenhorst, although he heard his mouth move, and there were a number of individuals speaking with Mr. Hollenhorst at the same time. So there was a number, there were a number of things going on in the hallway at that time, and this is not. He's probably the most impartial witness, isn't he, to hearing this discussion? I'm not certain. There's certainly no evidence to the fact that he is the most impartial, but he doesn't have, based on the evidence and the record, any interest in the case. But I do find it important that Mr. Chavez, given his role, or notwithstanding his role, and the fact that he is a lawyer, if he heard a comment like that, that he wouldn't ascribe a certain value or significance to it and bring it to the attention of the court or bring it to the attention of Mr. Miller. Now, that's something that I haven't addressed, but in thinking about the case, I certainly think not as a criticism of Mr. Chavez, but I think it's important, because we have to analyze, and the district court indeed did analyze it in this way. Statements were made, testimony was had, and there were a number of things going on at various times. And when you look at Mr. Hollenhorst, the fact that he was a law student or waiting bar results, his father was a fourth DCA justice, court of appeal justice, the fact that he was a prospective lawyer, if he, of course, passed the bar, the fact that he repeatedly and categorically denied having a bias in favor of law enforcement, either actually in favor or not against the law enforcement. So he was basically of the opinion. And when it came time to actually understanding that this was being imputed to him, he was very adamant in his tone that he had never before and never had had a bias, either in favor of law enforcement or against law enforcement, and that he would have brought that up during voir dire questioning. So I do not see, based on this record, either considering the statement that Chavez attributes to Mr. Hollenhorst or the statement that Mr. Miller and Ms. Lee attribute to Mr. Hollenhorst. I'm sorry, Your Honor. Mr. Miller was appellant's counsel, and Ms. Lee was his assistant at the time. Now she is a lawyer in the State of California. The thing that troubles me about this, it's the way it intersects with the Section 148 ammunition by the judge not to consider whether or not the plaintiff had been convicted or charged with a 148, because, first of all, I want to get my facts straight, but was he, Mr. McGregor, was he charged with a 148? He was not. He was not. Okay. So the Court wouldn't let that evidence come in, and indeed, when an expert testified, made mention of that during the testimony, the Court admonished the jury that they were not to consider it. Yet we do have testimony by Hollenhorst that he was aware of Penal Code Section 148. It was an issue in the trial, and he was also the foreman of the jury. And I can't help but question whether his knowledge and his inability to consider the fact that Mr. McGregor was not charged with it. It seems to me the inference, because of the judge's admonitions, was that he was charged and or convicted, that that might not have tainted the jury verdict itself. Your Honor, a couple of thoughts. There were no questions during voir dire regarding 148. In the many openings that counsel provided to the jury, there was no mention of 148. It is understood that Mr. Hollenhorst had dealt with 148s in the past while he was a clerk at the DA's office. He testified that it was an issue at trial. Clearly, 148 was an issue at trial, because at trial, the fact of the Penal Code Section came out, that indeed this was a case wherein Officer Collins had arrested Mr. McGregor for a Penal Code Section 148 violation. So that information certainly came out during trial. The question, though, is when did it come out? And it didn't come out, we know, during voir dire, nor did it come out in the many openings that were provided by counsel to the jury before voir dire commenced. So Mr. Hollenhorst, although he had worked on a couple 148s in his tenure at the DA's office, did not know at the time of voir dire that 148, or Penal Code Section 148, was going to be at issue. What was said by the attorneys was that this was a case about an alleged obstruction of a peace officer in the performance of his duties. And if you were familiar with Section 148, you would know that a case that's about obstruction of a police officer in the performance of their duties was about Penal Code Section 148? The evidence in the record indicates, and he testified, that he did not make that connection during voir dire. And even if he had, he did not entertain a bias either in favor or against law enforcement. And the one issue that I think speaks to this, or the piece of evidence that I think speaks to this, is that Mr. Hollenhorst testified at the second evidentiary hearing on the motion of new trial on jury misconduct, that he had been involved in three or four 148s, and that he had at one time decided, based on his conversations with the police officer involved with the charge, not to charge the 148, because he didn't believe that there was sufficient evidence to go forward. So I think that that assisted the district court in its evaluation as to the issue, and in particular with regard to Mr. Hollenhorst vis-à-vis Mr. Chavez and then Mr. Miller and Ms. Lee. That was really the issue, whether or not these statements occurred. And it was the district court's finding that they had not, or that it had not occurred. And certainly he did not entertain a bias in favor of law enforcement. That goes to whether he should have been on the jury. I'm sort of asking, since he had knowledge and experience with 148, by the time it did come out in the trial, and he participated in the jury deliberations, whether his knowledge of that, and whatever else he might have said about it, we just don't know, could have tainted his judgment without the evidence that Mr. McGregor hadn't been charged and hadn't been convicted. That's the ruling, I guess. Your Honor, if I understand your question, I believe that it goes to what Mr. Hollenhorst knew at the time that he participated in the jury. And I suppose that your response to that is, well, that doesn't matter, because the question is whether he was dishonest in responding to a voir dire question in such a way as to indicate bias. It may not be your answer. But that may be one of your answers. But the question, I mean, what she's asking you is not having to do with voir dire, but rather knowledge that he had in his head that may have tainted his role as a juror. Or could have been, you know, extrinsic evidence in his mind that he had that he considered during the deliberations. What was the verdict, by the way? Ado, in favor of the defendants. My response would be, of course, as Judge Reimer points out, one of the prongs to this whole analysis is that there has to be a showing that there was a dishonest statement or response to a material question posed during voir dire. That, frankly, has not been established. But to go to deliberation, whatever Mr. Hollenhorst put together in his mind based on the evidence and what he took to the deliberation, there is no evidence to suggest that he at any time harbored a bias in favor of law enforcement. There's no evidence of that. And so what we're left with is speculation. And I encourage the Court to, of course, look at what the district judge in a 29-page ruling determined was, in fact, not juror bias in his opinion. And as this Court knows, there has to be a showing of clear error, a firm and definite conviction on this Court's part that a mistake has been made. And the showing, frankly, has not been made. Mr. Hollenhorst came in, testified twice, once in January and once at the second evidentiary hearing, I believe it was in May, and convinced the Court, based on his demeanor, based on his responses to the questions, that he did not harbor a bias in favor of law enforcement. The statement that is attributed to him by Mr. Miller and Ms. Lee with regard to the 148 issue, I think, is problematic by virtue of the fact that Mr. Miller and Ms. Lee, of course, are advocates for the plaintiff. But in addition, when you look at their declarations, the statement's identical in quotes. And yet Mr. Miller didn't memorialize that statement until about three days or so before he filed the motion for new trial, about a month after he heard the statement. And as he indicated to the Court, even though he was shocked and aghast that he heard this statement from Mr. Hollenhorst, he took no notes. He did not seek to memorialize that statement in any way, shape or form. Ms. Lee testifies that she took down the statement and wrote it into or typed it into her computer about a week after the statement was made. And yet, notwithstanding the fact that on cross-examination she says, well, I didn't really hear it that way, she, too, puts in her declaration the identical language in quotes that Mr. Miller ascribes to Mr. Hollenhorst. For those reasons alone, and Mr. Hollenhorst, of course, repeated in categorical denial of a bias in favor of law enforcement, juror misconduct was not established and the district court did not commit clear error. With that, I would submit. Thank you, Your Honor. Thank you, Mr. Miller. Your Honors, it is precisely Mr. Taglianti's representation of the record and your question, Judge Reimer, regarding juror misconduct, which is the basis for me asking this to begin with, there was evidence of juror bias, and this is indicated by an independent officer of the court saying that he heard Mr. Hollenhorst say they should have known I would be for the police. The district court characterized the pro se clerk as having absolutely no interest in the outcome of the matter. So it's irrelevant what I thought or what Ms. Lee thought. The critical issue is that you have an officer of the district court saying he heard the juror say they should have known I would be for the police, and that is significant indicia of bias. The second issue I want to turn to of juror Hollenhorst is that of his testimony under oath. The chart was drawn up for this court at page 3, going through page 4 of the Pelham's reply brief. It shows that Mr. Hollenhorst was totally inconsistent between the hearing for a motion for new trial in January and that of May. When asked, did you say officers don't issue PC 148s when a suspect has done something wrong, in January he said, I don't recall, in May he said, this is not something I would say. When asked if he made the statement officers don't issue PC 148 when a suspect has not done anything wrong, would you reveal that to the court, in January he said no. Do you recall making any statement regarding officers and penal code 148? In January he said no. In May he said he made the statement. It is totally inconsistent. And his inconsistencies during the testimony in the motion for the new trial, coupled with that of the pro se clerk, are grounds for reversal. Two to two. Your time has expired, so. May I make two more comments? I realize. Please, your time has expired. Thank you. Thank you, Your Honor. A matter just argued to be submitted.
judges: Rymer, Wardlaw, Reed